## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OGLALA SIOUX TRIBE,                    :
                                       :
                    Plaintiff,         :
                                       :
          v.                           :     Civil Action No. 01-2679 (GK)
                                       :
UNITED STATES ARMY CORPS OF            :
     ENGINEERS, et al.,                :
                                       :
                    Defendants.        :

### MEMORANDUM OPINION

On December 28, 2001, Plaintiff Oglala Sioux Tribe ("Oglala Tribe" or "Tribe") filed this action against the United States Army Corps of Engineers ("Corps"), various Corps officials, and the United States (collectively, "Defendants"). The Oglala Tribe seeks declaratory, injunctive, and mandamus relief relating to Defendants' transfer of lands and recreational areas and/or granting of perpetual leases for recreational areas in the Missouri River Basin to the South Dakota Department of Game, Fish and Parks ("South Dakota"), the Cheyenne River Sioux Tribe, and the Lower Brule Sioux Tribe under Title VI of the Water Resources Development Act of 1999 ("WRDA"), Pub. L. No. 106-53, 113 Stat. 269 (1999), as amended by Pub. L. No. 106-541, 114 Stat. 2572 (2000).

This matter is now before the Court on the parties' responses to the Order to Show Cause issued on July 7, 2003, which directed Plaintiff "to show cause...why this case should not be dismissed for lack of subject matter jurisdiction." 7/7/03 Order at 1 ("Show

Cause Order"). Upon consideration of the parties' Responses, the Plaintiff's Reply, and the entire record herein, for the reasons stated below, this case is **dismissed**.

## I.   BACKGROUND[1]

### A.   Historical Background

The Oglala Sioux Tribe is a distinct band of the Teton Division of the Sioux Nation. The Tribe consists "of approximately 41,000 citizens with territory of over 4,700 square miles in the southwestern portion of South Dakota," which includes portions of the Missouri River basin. 2d Am. Compl. at ¶¶ 2, 14. The Oglala Tribe claims that they have used and occupied some portions of the Missouri River basin "[s]ince time immemorial." Id. at ¶ 14 (including description of relevant portion of the basin).

In 1825, the Tribe entered into a treaty of friendship and protection with the United States. See 7 Stat. 252 ("1825 Treaty"). The Oglala Tribe claims that under the 1825 Treaty, it became a protectorate nation of the United States. See id. at ¶ 18.

In 1851, the Oglala Tribe and the other bands of the Teton Division of the Sioux Nation entered into a treaty which was later

---

[1]     For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. Shear v. National Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979). Thus, the facts set forth herein are taken from Plaintiff's Complaint, unless otherwise specified.

ratified by Congress.   11 Stat. 749 ("1851 Treaty").   The 1851
Treaty created a defined territory for the Teton Division bands,
which covered much of the area in the Missouri River basin, from
the Mississippi River westward.   Thereafter, United States citizens
began to encroach upon the land set aside for the tribes in the
1851 Treaty.

In 1868, various Sioux bands, including the Teton band,
entered into another treaty with the United States in an effort to
end the struggle created by this encroachment.   15 Stat. 635 ("1868
Fort Laramie Treaty" or "1868 Treaty").   The 1868 Fort Laramie
Treaty was ratified by Congress and proclaimed effective by the
President in 1869.   Article 2 of the 1868 Treaty designated
specific territory for the various Sioux bands within the land
defined in the 1851 Treaty, which became known as the Great Sioux
Reservation.   Under Article 12 of the 1868 Treaty, no future
treaties for cessions of land in the Great Sioux Reservation would
be valid "unless executed and signed by at least three-fourths of
all the adult male Indians, occupying or interested in the [land to
be ceded]."   15 Stat. 635, as quoted in United States v. Sioux
Nation of Indians, 448 U.S. 371, 376 (1980) ("Sioux Nation").

In 1877, Congress ratified and confirmed a cession agreement--
the Act of February 28, 1877, ch. 72, 19 Stat. 254 ("1877 Act")--
that was purported to be made between the relevant Sioux bands and
commissioners working on behalf of the United States.   The 1877 Act

ceded over 7 million acres of territory in the western portion of the Great Sioux Reservation, primarily the Black Hills region, to the United States.  It was later determined that "the treaty was presented just to Sioux chiefs and their leading men.  It was signed by only 10% of the adult male Sioux population[,]" not three-fourths as required by Article 12 of the Fort Laramie Treaty. <u>Sioux Nation</u>, 448 U.S. at 381-82 (ultimately determining that the United States was required to pay interest for the unconstitutional taking of land carried out through the 1877 Act).

In 1889, Congress passed legislation--the Act of March 2, 1889, ch. 405, 25 Stat. 1889 ("1889 Act")--that provided for the further, conditional diminution of the remaining portions of the Great Sioux Reservation.  The 1889 Act created six smaller, distinct reservations within the Great Sioux Reservation for the various Sioux bands.  In addition, it provided that all of the land not contained in those distinct reservations would be returned to the public domain of the United States and subsequently opened for settlement.  However, before the 1889 Act could take effect, Congress required that the United States had to gain the "acceptance and consent" of three-fourths of all the occupying or interested adult Indian males, as required by Article 12 of the Fort Laramie Treaty, which had to be acquired and proclaimed by the President within one year of the Act, after he was presented with

"satisfactory proof" of that acceptance and consent.  <u>See</u> 1889 Act, § 28.

After Congress passed the 1889 Act, the Secretary of the Interior sent a three-member commission to obtain the required acceptance and consent of the eligible Sioux males ("Sioux Commission"), which the Sioux Commission determined could be provided by the signing of a quit-claim deed.  At that time, "5,678 adult male members [of the tribes] were eligible to give consent under article 12 of the 1968 Treaty and section 28 of the 1889 Act, 3,942" such that three-fourths approval would require 4,259 men to give consent.  2d Am. Compl. at ¶ 29.  While the Sioux Commission collected 4,463 signatures, they "obtained no more than 3,942 valid signatures on quit claim deeds...[because] at least 512 of those were invalid...[having been provided by] non-Indian persons,...persons of mixed blood,...persons not members of the bands and tribes signatory to the 1868 Treaty,...underage (non-adult) Indian persons,... [and] female[s]," or were duplicate signatures.  <u>Id.</u>  In addition, the Sioux Commission obtained a "majority of the signatures...through coercion, fraud and bribery." <u>Id.</u> at ¶ 30.

In early 1890, the Sioux Commission submitted a report of its activities to President Benjamin Harrison.  <u>See</u> <u>Report and Proceedings of the Sioux Commission</u>, Sen. Exec. Doc. 51, 51st Cong. 1st Sess. (1890) ("Commission Report").  The Commission Report

contained a list of the names of each signatory of a quit-claim deed, which when compared with "[t]he census records contained in the [] Commission Report show [] that the Commission failed to obtain signatures from three-fourths of the adult male members eligible to give consent under article 12 of the 1868 Treaty and section 28 of the 1889 Act."  2d Am. Compl. at ¶ 31.

However, on February 10, 1890, President Harrison "proclaim[ed] the acceptance of [the 1889 Act] by the different bands of the Sioux Nation of Indians, and the consent thereto by them as required by the [1889 Act]" and stated that the 1889 Act was "declared to be in full force and effect."  26 Stat. 1554 ("1890 Proclamation").  Thereafter, "approximately one-half [of the Great Sioux Reservation that remained after the 1877 Act] was restored to the public domain...while six separate reservations were carved out of the remainder."  Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 589 (1977) (internal quotations and citations omitted) ("Rosebud Sioux").  One of those six reservations is the Piney Ridge Reservation of the Oglala Sioux Tribe.

**B.    Relevant Legislation Enacted After the 1889 Act**

In response to flooding along the Missouri River in the early-to-mid twentieth century, Congress passed the Flood Control Act of 1944 ("FCA"), 33 U.S.C. §§ 701, et seq.  The FCA authorized the Missouri River Pick-Sloan Program, which authorized the Corps to develop a comprehensive flood control plan by constructing various

dams and reservoirs along the Missouri River.  After passing the
FCA, "[s]even subsequent Acts of Congress authorized limited
takings of Indian lands for hydroelectric and flood control dams on
the Missouri River in both North and South Dakota."  <u>South Dakota
v. Bourland</u>, 508 U.S. 679, 683 (1993).  Plaintiff alleges that to
complete these various flood control programs, the Corps "acquired
land [within the Great Sioux Reservation] by condemnation or by
<u>mense</u> <u>conveyance</u>" to which the Oglala Sioux Tribe was not a party,
including approximately 105 shoreline recreational areas in South
Dakota.  2d Am. Compl. at ¶ 37-38.

More recently, Congress passed new legislation affecting the
Corps' management of the Missouri River by passing the Water
Resources Development Act ("WRDA"), Pub. L. No. 106-53, 113 Stat.
269 (1999), <u>as</u> <u>amended</u> <u>by</u> Pub. L. No. 106-541, 114 Stat. 2572
(2000).  Title VI of the WRDA, Pub. L. No. 106-53, §§ 601-609,
called for implementation of a plan to restore terrestrial wildlife
habitat that was lost due to flood-control projects along the
Missouri River.  Specifically, §§ 603-606 directed the Corps to
transfer title or grant perpetual leases for recreational areas
surrounding FCA projects to the South Dakota Department of Game,
Fish and Parks and two other Sioux Tribes.  Under Title VI, this
transfer was to occur by January 1, 2002.  <u>See</u> Pub. L. No. 106-53,
§ 605(a)(1)(B).

In addition, § 607 of Title VI provided that

[n]othing in this title diminishes or affects--(1) any water right of an Indian Tribe; (2) any other right of an Indian Tribe, except as specifically provided in another provision of this title; (3) any treaty right that is in effect on the date of enactment of this Act; (4) any external boundary of an Indian reservation of an Indian Tribe; (5) any authority the State of South Dakota that relates to the protection, regulation, or management of fish, terrestrial wildlife, and cultural and archaeological resources, except as specifically provided in this title; or (6) any authority of the Secretary, the Secretary of the Interior, or the head of any other Federal agency under a law in effect on the date of enactment of this Act, including--(A) the National Historic Preservation Act (16 U.S.C. 470 et seq.); (B) the Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa et seq.);...(G) the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.);....

Pub. L. No. 106-53, § 607(a). In particular, the Native American Graves Protection and Repatriation Act ("NAGPRA") "declared ownership or control of Native American human remains, associated and unassociated funerary objects, sacred objects and items of cultural patrimony ('Native American cultural items') excavated or discovered on federal or tribal lands...to be vested either in lineal descendants...or Indian tribes," while the National Historic Preservation Act ("NHPA") "provided enforceable legal protection for all historic property included in the National Register [of Historic Places] or eligible for inclusion."  2d Am. Compl. at ¶ 43, 45.

C.  **The Present Action**

In December 2001, Plaintiff "notified the [] Corps pursuant to NAGPRA that it claims ownership and control of all Native American

cultural items excavated or discovered, <u>inter alia</u>, at all of the recreational areas or other lands that are the subject of this action."  2d Am. Compl. at ¶ 44.  In an attempt to stop the Corps' transfer of recreational areas as set out in the WRDA, the Oglala Tribe brought the instant action on December 28, 2001.[2]  On January, 29, 2002, Plaintiff filed an Amended Complaint, as well as a Motion for a Temporary Restraining Order and Preliminary Injunction, with Judge Paul Friedman of this District.

At that time, a related case was pending before Judge Friedman, <u>Crow Creek Sioux Tribe v. White</u>, CA 01-76.  The <u>Crow Creek</u> plaintiff brought an action against the Secretary of the Army and others to stop the WDRA transfer of recreation lands, arguing that "transfer of the land to South Dakota would irreparably harm the Tribe's interests in cultural artifacts and tribal heritage sites by removing the lands from coverage under the federal cultural protection statutes and by lessening the federal government's ability to enforce these statutes on the transferred lands."  <u>Crow Creek v. Brownlee</u>, 331 F.3d 912, 915 (D.C. Cir. 2003).  On February 1, 2002, Judge Friedman held argument on <u>Crow Creek</u>'s Motion for Preliminary Injunction, and denied that Motion

---

[2]   On January 28, 2002, the Rosebud Sioux Tribe moved to intervene as a party plaintiff in this action, and that motion was granted on February 12, 2002.  <u>See</u> 2/12/02 Order.  However, on July 14, 2003, the Rosebud Sioux Tribe moved to dismiss without prejudice its intervenor-plaintiff action, and that motion was granted.  <u>See</u> 9/15/03 Order, <u>as amended by</u> 10/29/03 Order.

from the bench, "holding that the proposed title transfer was consistent with the Constitution and federal law." Crow Creek v. Brownlee, 331 F.3d at 915; see also 2/1/02 Order in CA 01-76.  On February 5, 2002, the Crow Creek plaintiff filed an emergency interlocutory appeal of Judge Friedman's denial of its motion for a preliminary injunction.

Subsequently, on or about February 8, 2002, the Oglala Tribe and Defendants began to take action with respect to the lands at issue in this case.  The Oglala Tribe filed "Notices of Lis Pendens in accordance with...the Federal Rules of Civil Procedure...and the laws of the State of South Dakota, giving constructive notice of this action with respect to...each of the recreational areas and other lands that are the subject of this action and within the boundaries of the Great Sioux Reservation," while "Defendants purported to transfer or lease to the State of South Dakota some but not all of the recreational areas and other lands that are the subject of this action."  2d Am. Compl. at ¶¶ 49-50.

On July 16, 2002, the Oglala Tribe informed the Court that it was participating as a non-party in the mediation of the related Crow Creek case before Judge Friedman.  On August 9, 2002, Judge Friedman denied without prejudice the Oglala Tribe's Motion for a Temporary Restraining Order and Preliminary Injunction and ordered the Oglala Tribe to submit status reports regarding its involvement in the Crow Creek mediation.  See 8/9/02 Order.  Between October

2002 and March 2003, the Oglala Tribe submitted three such reports, each of which merely noted the Tribe's involvement in the ongoing mediation and stated that the parties were going to present a joint scheduling order for briefing in this case.  See, e.g., 10/1/02 Report to Court, 1/16/03 Report to Court, and 3/31/03 Report to Court

On March 17, 2003, the D.C. Circuit issued a decision regarding Crow Creek's interlocutory appeal of Judge Friedman's denial of its motion for a preliminary injunction.  See generally, Crow Creek, supra.  The D.C. Circuit found that the Crow Creek Tribe had "utterly failed to establish an 'actual or imminent' injury in fact."  Id. at 916.  Thus, the court determined that the Crow Creek Tribe "lack[ed] standing to bring [its] action in federal court" and "remand[ed] the action to the district court for entry of judgment of dismissal for lack of subject matter jurisdiction."  Id. at 918.

On July 7, 2003, in response to the D.C. Circuit's decision in the Crow Creek appeal, Judge Friedman issued an order directing the Oglala Tribe to show cause why this case should also not be dismissed for lack of subject matter jurisdiction.  On July 25, 2003, the Oglala Tribe responded to the show cause, conceding that the Amended Complaint's first four claims for relief were directly addressed in the D.C. Circuit's Crow Creek decision and should thus be dismissed without prejudice.  Plaintiff then stated that its

-11-

fifth, sixth, and seventh claims for relief were still ripe because they were not addressed by the <u>Crow Creek</u> decision.  Plaintiff also argued that under those remaining claims, it met the Article III standing requirements enunciated in the <u>Crow Creek</u> decision.

On August 23, 2003, this case was reassigned from Judge Friedman to this Court.  Thereafter, Defendants moved to file a reply to the Oglala Tribe's show cause response, and the Oglala Tribe moved to file a second amended complaint, consistent with the claims outlined in its show cause response.

On September 15, 2003, a Status Conference was held in this matter.  At that Status Conference, the Court granted the Oglala Tribe's motion for leave to file a second amended complaint and ruled that Defendants' reply to the Oglala Tribe's show cause response could present arguments for dismissal of this action on grounds of lack of subject matter jurisdiction.  This matter is now before the Court on the Oglala Tribe's Response to the Order to Show Cause issued on July 7, 2003 ("Pl.'s Resp."), Defendants' Response to the Order to Show Cause ("Defs.' Resp."), and the Oglala Tribe's Reply to Defendants' Response to the Order to Show Cause  ("Pl.'s Reply").

## II.  STANDARD OF REVIEW

It is the plaintiff's burden to establish that the court has subject matter jurisdiction to hear the case.  <u>In re Swine Flu Immunization Prods. Liab. Litig.</u>, 880 F.2d 1439, 1442-43 (D.C. Cir.

-12-

1989); <u>Jones v. Exec. Office of the President</u>, 167 F. Supp. 2d 10, 13 (D.D.C. 2001).  While the Court must accept as true all factual allegations contained in the complaint, <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 164 (1993), "plaintiff's factual allegations in the complaint...will bear closer scrutiny" when the court's subject matter jurisdiction has been challenged.  <u>Grand Lodge of the Fraternal Order of Police v. Ashcroft</u>, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal quotation marks omitted).  In making its determination regarding the existence of subject matter jurisdiction, the court may consider matters outside the pleadings. <u>Lipsman v. Sec'y of the Army</u>, 257 F. Supp. 2d 3, 6 (D.D.C. 2003).

## III. **ANALYSIS**

The Oglala Tribe's Second Amended Complaint asserts four claims for relief against Defendants.

First, Plaintiff alleges that it has suffered an injury to its legally-protected interests in the recreational areas and other lands at issue in this action because of Defendants' continued "den[ial] that the boundaries of the Great Sioux Reservation have never been diminished or otherwise altered by the 1889 Act or any other subsequent treaty or act of Congress" and Defendants' continued "refus[al] to acknowledge and abide by the 1868 Fort Laramie Treaty." 2d Am. Compl. at ¶¶ 55-56.

Second, the Oglala Tribe claims that it has suffered an injury to its legally-protected interests in the recreational areas and other lands at issue in the case based upon Defendants' past and future "transfer or lease [of the recreational areas and other lands] to the State of South Dakota pursuant to section 605 of the WRDA" without the "voluntary consent [of the relevant bands of the Sioux Nation] in accordance with article 12 of the 1868 Fort Laramie Treaty." Id. at ¶¶ 60-62.

Third, Plaintiff alleges that it has suffered an injury to its legally-protected interests in the recreational areas and other lands at issue in this matter based upon Defendants' failure to fulfill their "trust responsibility to the Oglala Sioux Tribe under the 1825 Treaty, 1851 Fort Laramie Treaty, 1868 Fort Laramie Treaty and federal statutory and common law" by consulting with and reasonably accommodating the view of the Tribe before transferring or leasing land to the State of South Dakota. Id. at ¶¶ 64-67.

Finally, Plaintiff alleges that it has suffered an injury to its legally-protected interests "in the Native American cultural items and other historic properties within the recreational areas and other lands" at issue in this case because the NHPA "requires [the Corps] to locate, inventory and nominate for inclusion in the National Register of Historic Places" all of these items. Id. at ¶¶ 69-71.

-14-

Plaintiff asks for a number of specific types of relief for these alleged injuries. The Tribe seeks declarations: (1) that the 1889 Act "never became effective", id. at ¶ F1;[3] (2) that the transfers and leases of the recreational areas and other lands at issue that Defendants have made pursuant to the WRDA "are without force or effect", id. at ¶ F2; and (3) that Defendants "are required to consult with and reasonably to accommodate the views" of the Tribe in transferring, leasing, and/or managing the recreational areas and other lands at issue, id. at ¶ F4.

Plaintiff also requests an injunction "prohibiting Defendants from transferring any recreational areas and other lands that are subject to this action and within the borders of the Great Sioux Reservation...without the voluntary consent of each of the bands that were signatory to the 1868 Fort Laramie Treaty." Id. at ¶ F3. Finally, Plaintiff asks the Court to grant mandamus relief requiring Defendants "to consult with and reasonably to accommodate the views" of the Tribe in transferring, leasing, and/or managing the recreational areas and other lands at issue, and also "requiring [the Corps] to locate, inventory and nominate for inclusion in the National Register...all Native American cultural items and other historic properties within the recreational areas and other lands [at issue in this case]." Id. at ¶¶ F5, F6.

---

[3] The Plaintiff's Prayer for Relief is denoted as Section F in the Second Amended Complaint.

Defendants contend that Plaintiff has failed to establish Article III standing for its first three claims, arguing that the Tribe does not have legally protected interests in the recreational areas and other lands at issue under Article 12 of the 1868 Treaty. Defendants also argue that even if Plaintiff did have standing, its claims are barred by the United States' sovereign immunity and by the statute of limitations. Finally, Defendants assert that Plaintiff has failed to establish standing for, and cannot seek mandamus relief for, its fourth claim because the NHPA creates only discretionary duties that the Corps cannot be required to perform.

**A.   Plaintiff Lacks Standing to Bring Its First Three Claims Because It Does Not Have a Legally Protected Interest in the Recreational Areas and Other Lands at Issue.**

Whether a plaintiff has standing to pursue his or her claim is a threshold question of subject matter jurisdiction. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). In order to establish standing under Article III, a plaintiff must demonstrate (1) "a 'concrete and particularized' injury that is 'actual or imminent,'" (2) "'caused by, or fairly traceable to, an act that the litigant challenges in the instant litigation,'" and (3) "'redressable by the court.'" Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n, 509 F.3d 562, 567 (D.C. Cir. 2007) (quoting Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)). A plaintiff's alleged injury in fact must be concrete and particularized and not conjectural, hypothetical or speculative.

-16-

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992); <u>Sierra Club v. EPA</u>, 292 F.3d 895, 989 (D.C. Cir. 2002).

In this case, Plaintiff alleges that the Corps' past and future actions under Title VI of WRDA will cause it to suffer an injury in fact to its interests in the recreational areas and other lands at issue.  The Oglala Tribe asserts that it has a legal interest in those lands designated in the 1868 Fort Laramie Treaty, specifically in Article 12, and that Defendants owe it a trust responsibility over those lands, as established by "the 1825 Treaty, 1851 Fort Laramie Treaty, 1868 Fort Laramie Treaty and federal statutory and common law."  2d Am. Compl. at ¶ 64.

Defendants argue that the Tribe does not have any valid legal interests in the land at issue under Article 12 of the 1868 Fort Laramie Treaty because there is no cession or treaty at issue in the Corps' transfer of lands, only Congress' unilateral action under Title VI of the WRDA.  Furthermore, Defendants argue that the Tribe will sustain no present injury by the transfer of the lands at issue because Congress already chose to abrogate any interest in those lands under the 1889 Act, the FCA, and Title VI of WRDA.  In response, the Oglala Tribe argues that it does have a valid injury in fact because "the [1889] Act..., like many other 'surplus land acts' enacted by Congress during the late 19th and early 20th century, was not intended and therefore did not have the effect to diminish or otherwise alter the boundaries of the Great Sioux

Reservation established by...the 1868 Fort Laramie Treaty." Pl.'s Reply at 3.

The Court recognizes the possible injustice done to the Oglala Tribe, and possibly others as well, if the Sioux Commission failed to legally collect the signatures required to make the 1889 Act legally effective. See 2d Am. Compl. at ¶ 31 (asserting that the Sioux Commission did not collect valid signatures from three-quarters of tribal, adult males). The Court also recognizes possible injuries that could result from the Government's alleged failure to exercise its trust responsibility to the aboriginal interests of the Oglala, and other tribes, in the lands held in the Great Sioux Reservation. See Haida Nation v. British Columbia (Minister of Forests), 2002 BCCA 147 (finding Canadian government officials had a responsibility to consult with and accommodate a tribe before granting a tree farm license, arising from the government's fiduciary duty and the tribe's aboriginal interests).

However, the Court finds the Tribe cannot assert a valid legal interest to the lands at issue in this case because those interests were abrogated by the 1889 Act.

First, Article 12 of the 1868 Fort Laramie Treaty does not apply to this action because there is no present cession of or treaty concerning the lands at issue. These lands were removed from what remained of the Great Sioux Reservation, and were thus

taken out of the control and interest of the tribes, once the 1889 Act went into effect.  While the Tribe argues that the 1889 Act was not properly ratified, given the Sioux Commission's failure to garner the consent of three-fourths of the adult tribal males, it is undisputed that the United States government acted upon the supposed ratification by creating six reservations for the various tribes, including the Oglala Tribe's Piney Ridge Reservation, and returning the other land to the public domain.  <u>Rosebud Sioux</u>, 430 U.S. at 589.  In fact, the <u>Rosebud Sioux</u> Court noted that the "termination of Reservation status [contained in the 1889 Act] was agreed to by three-fourths of the adult male Indians on the Great Sioux Reservation, S.Ex.Doc. 51, 51st Cong., 1st Sess. 234, 242 (1890)."  <u>Id.</u> at 589 n. 5.

While the constitutionality of the 1889 Act has not yet been litigated, the Supreme Court has previously found that "regardless of whether land [once held by Indians] is conveyed pursuant to an Act of Congress for homesteading or for flood control purposes, when Congress has broadly opened up such land to non-Indians, the effect of the transfer is the destruction of pre-existing Indian rights to regulatory control."  <u>Bourland</u>, 508 U.S. at 692.

In this case, it is undisputed that the land at issue has been used, in part, as recreational areas for non-Indians for some time.  <u>See</u> 2d Am. Compl. at ¶ 38.  In addition, Congress authorized the transfer of land at issue by passing the WRDA, which does not even

mention the 1868 Fort Laramie Treaty or any rights the Tribe might assert under it.[4]   Given these facts, the Court cannot conclude that the Oglala Tribe has any legal interest that would allow it to presently seek declaratory and/or injunctive relief regarding those lands.

In dealing with prior transfers of land for flood control purposes, the Supreme Court found that in passing the FCA, "Congress gave the [Corps], not the [t]ribe[s], regulatory control over the <u>taken</u> area." <u>Bourland</u>, 508 U.S. at 691 (emphasis added). In addition, in assessing the rights of tribes to lands previously contained in the Great Sioux Reservation, the Court also found that Congress can act to change tribal boundaries even though there was no evidence that the legislation had been ratified.  <u>See Rosebud Sioux</u>, 430 U.S. at 615 (holding that even though there was no evidence that the 1904 Act had been ratified, the statutory

---

[4]    In particular, § 605 of the WRDA specifically addresses the interests of Plaintiff in the Corps' transfer of land to the State of South Dakota, stating that "[a]ll permits, rights-of-way, and easements granted by the Secretary to the Oglala Sioux Tribe for land on the west side of the Missouri River between the Oahe Dam and Highway 14, and all permits, rights-of-way, and easements on any other land administered by the Secretary and used by the Oglala Sioux Rural Water Supply System, are granted to the Oglala Sioux Tribe in perpetuity to be held in trust under section 3(e)of the Mni Wiconi Project Act of 1988 (102 Stat. 2568)."  Pub. L. No. 106-53, § 605(a)(1)(B).  If the Secretary previously had the power to grant permits, rights-of-way, and easements to the Tribe for the land at issue, that is further acknowledgment that the Tribe did not possess that land prior to passage of the WRDA.  <u>See</u> Black's Law Dictionary 527 (7th Ed. 1999) (defining easement, in part, as "the right to use" land "owned by another person").

language and legislative history showed  that "[t]he intent of Congress in the 1904, 1907, and 1910 Acts was to change the boundaries of the original 1889 Rosebud Reservation").

In sum, in assessing what rights, if any, the Oglala Tribe may have under the 1868 Fort Laramie Treaty to the recreational areas and other lands at issue, the Court is mindful that

> in dealing with the validity of the cession of tribal lands enacted in contravention of a treaty requiring three-fourths Indian consent..."it was never doubted that the power to abrogate [the treaty] existed in Congress ...[such that] the judiciary cannot question or inquire into the motives which promoted the enactment of [the cession] legislation." Although [the administrative commission] failed to garner the signature of three-quarters of the Indians in consent of the proposed changes, Congress understandably relied on this holding as authorizing it to diminish unilaterally the Reservation boundaries.

Rosebud Sioux, 430 U.S. at 594, quoting Lone Wolf v. Hitchcock, 187 U.S. 553, 556, 558 (1903).

In this case, regardless of whether the Crook Commission received the required authorization to cede tribal lands under Article 12 of the 1868 Fort Laramie Treaty, and thus Section 28 of the 1889 Act, the United States government took action to diminish Reservation boundaries at that time and Congress passed many acts "to [further] change the boundaries of the original 1889 Rosebud Reservation." Rosebud Sioux, 430 U.S. at 615 (discussing Congress' passage of such acts in 1904, 1907, and 1910); see also Sioux Nation, 448 U.S. at 383 n. 14 (stating that "later congressional

actions [had] the effect of further reducing the domain of the Great Sioux Reservation").

Thus, Congress, through the 1889 Act and other such legislation, authorized and acted upon the diminution of tribal lands previously held in the Great Sioux Reservation, including the lands at issue in this case. See Sioux Nation, 448 U.S. at 382 (stating that passage of the 1877 Act and subsequent transfer of the Black Hills portion of the Great Sioux Reservation "had the effect of abrogating the [1868] Fort Laramie Treaty") (emphasis added). Accordingly, the Court concludes that the Oglala Tribe does not have a valid legal interest in the recreational areas and other lands at issue because any interest was extinguished by the 1889 Act, once it became effective, and Congress' enactment of subsequent legislation.

Second, while the Tribe relies upon the Haida Nation case to support the assertion that Defendants owe the Tribe a trust responsibility based upon its aboriginal interest in the lands at issue, the facts of this case are not similar to those of Haida Nation. Specifically, the Haida Nation court rested its findings, in part, on the fact that the tribe had never "surrendered their Aboriginal rights by treaty, and their Aboriginal rights ha[d] not been extinguished by federal legislation." 2002 BCCA 147 at ¶ 22 (internal quotations and citations omitted). In addition, the Canadian court concluded that "the fiduciary duty of the

-22-

[government] to the aboriginal peoples [was grounded in] a general guiding principle for s. 35(1) of the Constitution Act, 1982," which states that "[t]he existing aboriginal and treaty rights of the aboriginal peoples of Canada are hereby recognized and affirmed."   Id. at ¶¶ 36-37.

In this case, the Court has already determined that the Oglala Tribe's rights to the land at issue had been extinguished by the 1889 Act, once it became effective, and other acts.   See discussion, supra.  Moreover, the United States Constitution does not contain a similar acknowledgment of aboriginal tribal rights. Thus, the Oglala Tribe cannot assert a valid aboriginal interest in the recreational and other lands at issue in this case, and Defendants cannot be found to have a trust responsibility over those lands.  See also Bourland, 508 U.S. at 695 (finding "no evidence in the relevant treaties [including the 1868 Fort Laramie Treaty and the 1889 Act] or statutes [including the FCA] that Congress intended to allow the [t]ribe to assert regulatory jurisdiction over these lands pursuant to inherent sovereignty").

In sum, the Court concludes that the Oglala Sioux Tribe cannot establish standing to bring its first three claims because it cannot assert an injury in fact to any valid interest in the recreational areas and other lands at issue in the case.[5]

---

[5]   Moreover, given that any injury to the Tribe occurred when the 1889 Act became effective and subsequent acts of Congress
                                                        (continued...)

**B.    Defendants Do Not Have Any Mandatory Obligations.**

Section 106 of the NHPA requires

> [t]he head of any Federal agency having direct or
> indirect jurisdiction over a proposed Federal or
> federally assisted undertaking in any State...shall,
> prior to the approval of the expenditure of any Federal
> funds on the undertaking..., take into account the effect
> of the undertaking on any district, site, building,
> structure, or object that is included in or eligible for
> inclusion in the National Register.

16 U.S.C. § 470f.  Section 110 of the NHPA was added in 1980 to "clarif[y] and codif[y] the minimum responsibilities expected of Federal agencies in carrying out the purposes of th[e] Act." Lee v. Thornburgh, 877 F.2d 1053, 1057 (D.C. Cir. 1989), (quoting H.R. Rep. No. 1457, 96th Cong., 2d Sess. 36 (1980)).

In this case, the Oglala Tribe claims that the NHPA requires the Corps "to locate, inventory and nominate for inclusion in the National Register...all Native American cultural items and other historic properties within the recreational areas and other lands [at issue in this case]." 2d Am. Compl. at ¶ F6.  Defendants argue that Plaintiff's NHPA claim must be dismissed for lack of a

---

[5](...continued)
were enacted, and not by the transfer of land designated in Title VI of the WRDA, the second and third standing requirements cannot be met--any injury to the Tribe's interests is neither a result of the Corps' present WRDA actions nor redressable by ordering the Corps to stop the transfers.  See Lujan, 504 U.S. at 560 (stating that to establish standing, there "must be a causal connection between the injury and the conduct complained of...[and] it must be likely...that the injury will be redressed by a favorable decision") (internal quotations omitted).

statutory basis, contending that the NHPA creates essentially procedural obligations and thus does not mandate agency action.

In deciding whether mandamus is appropriate in this action, the Court is mindful that mandamus is a "drastic remedy, to be invoked only in extraordinary situations." Consol. Edison Co. v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002). Accordingly, mandamus is available "only if: '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff.'" In re Medicare Reimbursement Litig., 309 F. Supp. 2d 89, 96 (D.D.C. 2004), (quoting N. States Power Co. v. Dep't of Energy, 128 F.3d 754, 758 (D.C. Cir. 1997)). In determining whether mandamus is available, an agency's duty must be "'so plainly prescribed as to be free from doubt and equivalent to a positive command.... [W]here the duty is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus.'" Id. (quoting Wilbur v. United States, 281 U.S. 206, 218-219 (1930)).

The Tribe argues that Section 110 creates a mandatory obligation for Defendants to "ensure that historic properties under the jurisdiction or control of the agency, are identified, evaluated, and nominated to the National Register." 16 U.S.C. §

-25-

470h-2(a)(2)(A) (emphasis added).  However, a court in this District has already determined that "[t]he case law in this and other circuits holds that an agency's duty to act under the NHPA...is procedural in nature." <u>Nat'l Trust for Historic Pres. v. Blanck</u>, 938 F. Supp. 908, 925 (D.D.C. 1996), <u>aff'd</u> 203 F.3d 53 (D.C. Cir. 1999).

While Plaintiff tries to narrow the <u>Blanck</u> case to an examination only of Section 110(a)(2)(B), the <u>Blanck</u> court did not use such limiting language.  In fact, after examining the statutory language and the relevant case law, the <u>Blanck</u> court concluded that "Section 110 <u>does not affirmatively mandate</u> the preservation of historic buildings or other resources" and only requires an agency "to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process and with its own Historic Preservation Plan." 938 F. Supp. at 925 (emphasis added).  Because the NHPA does not create a  "plainly prescribed" duty to act on the part of the Corps, the Court concludes that mandamus relief is inappropriate and Plaintiff's fourth claim is dismissed.[6]

---

[6]     It should also be noted that Plaintiff acknowledges that the Corps has a "current section 110(a)(2) preservation program...[which includes] the recreational areas and other lands" at issue in this case, and notes that under that plan, the Corps has evaluated at least 25% of the possible historical sights on the lands at issue for inclusion on the Federal Register.  Pl.'s Reply at 9 n.2.  Our Circuit Court has stated that NHPA Section 110 has "a limited reach...aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control."  <u>Lee</u>, 877 F.2d at 1056.
(continued...)

**IV.   CONCLUSION**

For the reasons stated above, this case is **dismissed** because (1) Plaintiff has failed to show that it has standing to bring its first three claims, and (2) mandamus is not the appropriate relief for its fourth claim.  An appropriate Order will issue with this Memorandum Opinion.


March 15, 2008
           /s/_____
           Gladys Kessler
           United States District Judge


**Copies to:  Attorneys of record via ECF**

---

[6](...continued)
Thus, even if the Court were to conclude that mandamus was available under Section 110 of the NHPA, it appears that the Corps is not ignoring those duties because it has already planned for and acted upon its NHPA obligations in this case.